## Case No. 14,457.

### UNITED STATES v. The ANNA.

[2 Am. Law Reg. 421.]

District Court. D. Maryland. Feb., 1854.[1]

SHIPPING — PUBLIC REGULATIONS — FORFEITURE — ILLEGAL NUMBER OF PASSENGERS—INTENTION—PERSONAL LUGGAGE.

1. The limitation of two passengers for every five tons of a vessel's measurement, by the 1st and 2d sections of the passenger act of 1819 [3 Stat. 488], has been repealed by the 10th section of the act of 1848 [9 Stat. 220].

2. No conviction can be had under the passenger act of 1847 [9 Stat. 127], except where an illegal number of passengers has been taken on board at a foreign port. with the intention to bring them into the United States, and where such illegal number has been actually brought in; or where an illegal number has been taken on board at a port in the United States, with the intention to transport them to a foreign port. The mere intention to violate the law, formed in a foreign country, and not completed by the illegal importation, is insufficient.

---

if an exception or proviso be in a subsequent clause or statute (1 Term R. 320), or although in the same section. yet if it be not incorporated with the enacting clause by any words of reference (1 Barn. & Ald. 94), it is in that case matter of defence for the other party. and need not be negatived in the pleading (Matt. Dig. 275; Archb. Cr. Pl. 48. 3 Chit. Burn. Just. 456).

It is generally. but not always, sufficient. in an indictment for a misdemeanor created by statute, to describe the offence in the words of the statute. People v. Taylor. 3 Denio. 91. In an indictment for setting on foot a lottery. contrary to the statute. it is essential to specify the purpose for which the lottery was made; that being a part of the statute description of the offence. But a general statement of the purpose for which the lottery was made, is not enough. Some further description must be given where it is practicable to do so. Id.

There is no necessity to recite any public statute on which the indictment is founded: for the judges, ex officio. take notice of all public statutes. Dyer 155a; 2 Hawk. P. C. c. 25. § 100; 1 Saund. 153. note 3. But if it be recited with a material variance. and the indictment conclude "contrary to the form of the said statute." it will be fatal. though if it conclude generally, as, "contrary to the form of the statute in such case made and provided." without referring to the recited statute. the recital may be rejected as surplusage. 2 Hawk. P. C. c. 25. § 101; 6 Term R. 776. But the parts of a private act on which an indictment is framed, must be set out specially. as other facts. and a variance properly shown to the court will be fatal. 2 Hawk. P. C. c. 25. § 105. Neither the day on which a private statute was enacted, nor the title or preamble, need in any case be stated. But if set forth, it must be done with correctness, or, if the indictment conclude contrary to the statute aforesaid. the variance will be fatal. 1 Chit. Cr. Law, 277: Holt. 662; 2 Hawk. P. C. c. 25, § 106.

[1] [Affirmed in Case No. 14,458.]

3. In the determination of the liability of a vessel, under the passenger act of 1847, the court will be guided by her custom house measurement, which has been delivered by the surveyor of the port to the master or owner of the vessel, in preference to any subsequent measurement on the part of the government. ·

4. The term "personal luggage," in the act of 1847, only includes wearing apparel, bed and bedding of the passengers, required for their comfort and convenience of the voyage. and does not extend to furniture, stores, or other articles not necessary for their personal convenience.

5. The principles by which the court will be guided in the determination of the cases under the passenger act of 1847.

This was a libel filed by the district attorney of the United States, to enforce a forfeiture, under the acts of congress passed in relation to passenger vessels.

William Meade Addison, U. S. Dist. Atty.

Brown & Bume, for claimants.

GILES, District Judge. The case of U. S. v. The Anna, belonging to Bremen, has received the careful consideration of the court, since its adjournment. Its trial occupied the attention of the court for twelve days, and I do but justice to the learned counsel engaged in it, when I say, that the investigation has been conducted throughout, with a learning and ability, and an industry fully commensurate to the large amount depending on its issue, and the important interests connected with it. The barque Anna was seized by the collector of this port, on the 24th of December last, for an alleged violation of the acts of congress passed in reference to passenger vessels. She was claimed to be forfeited by the 2d section of the act passed 22d February. 1847. That section reads as follows: "That if the passengers so taken on board of such vessel, and brought into, or transported from the United States aforesaid, shall exceed the number limited by the last section to the number of twenty in the whole, such vessel shall be forfeited to the United States aforesaid, &c." The said barque was also claimed to be forfeited under the 2d section of the act of 1819, entitled "An act relating to passenger ships and vessels." and which act limited the number of passengers to be carried in any vessel to two for every five tons of the custom house measurement of such vessel. The seizure was regular, and no question has been raised in reference to it. The libel in this case was filed by the attorney for the United States, to enforce the forfeiture. And I understood him to contend, 1st. That the limitation of two passengers for every five tons of the vessel's measurement has never been repealed. 2dly. That the offence consists in taking on board, at a foreign port, more than the legal number of passengers, although the vessel may not bring more into this country than the legal number. 3dly. That the court must be guided in the investigation and determination of this case by the actual measurement of the barque. made since her last arrival here, by witnesses who

have testified on the trial; and that the government is not bound by the custom house measurement of said barque, a certificate of which had been given by the surveyor of the port to the captain of said barque. 4thly. That the term "personal luggage," in the act of 1847, must be confined to such articles as are ordinarily used and required by emigrant passengers on voyages of this kind, and cannot be construed to include furniture, stores, or other articles not requisite for their personal convenience on the voyage.

During the trial, the captain of the barque was offered as a witness by the claimants, but he was objected to by the attorney for the United States on the ground of incompetency. His testimony was, however, taken, subject to the exception that the court might have time to look into the question. I have done so, and am clearly of the opinion that he is not a competent witness in a case of this kind. Whatever might. be the rule of law on this subject in a proceeding in rem, instituted by a private suitor, and of which I say nothing, I think that in a case of seizure for a violation of any of our revenue or other acts of congress, where the offence consists in the wrongful act of the master of the vessel, and where the judicial sentence or decree is conclusive, not only with respect to the thing seized, but also with respect to the incidental rights and responsibilities of the parties concerned, the master is not a competent witness. And in my investigation of this case, I have not referred in any manner to the testimony of the captain.

The first law in relation to passenger vessels was passed on the 2d of March, 1819 [3 Stat. 488]. It provided, as I have stated, that no vessel should bring from any foreign port into the United States, or transport from the United States to any foreign port a greater number of passengers than two for every five tons of any ship or vessel, according to custom-house measurement. The trade of the importation of passengers was then in its infancy, and the legislators of that day never dreamed of the manner by which their good intentions would be frustrated, and the objects they sought by the enactment of that law wholly defeated. As the law contained no limit to the amount of freight to be brought in passenger vessels, and as the freight was always first taken in, it became the practice to get all the freight you could, and then crowd in the passengers afterwards. Ship fever and death was the consequence to hundreds of the victims of this imposition, until the humanity of the nation was aroused, and it appealed loudly to congress in 1847 for further legislation. That appeal was answered by the passage of the act of that year, to which I have already referred. That act came from the judiciary committee of the house, and was reported by Mr. Rathbun, of New York, no doubt after a careful review of the many

facts of imposition which the history of this trade into the port of New York for several years preceding, afforded. It protected the passenger by requiring the ship owner or master to afford him a certain space of superficial feet, varying in extent, according to the deck he occupied, for the accommodation of himself and his personal luggage. But it still retained the limitation of two passengers to every five tons of the vessel's measurement. It was found in the course of that year, that in many cases where passengers were taken on board a vessel, and the space required by the act of 1847 fully given to them, their number would exceed the proportion of two to every five tons. And as congress thought that the protection given to emigrants by the act of 1847 was full and ample, if faithfully enforced, by the 10th section of the act of 1848 they repealed the limitation of the act of 1819. The attorney for the United States contends that this section only repeals "the first section of the act of 1819," and not the second section; but the first is the section that virtually contains and prescribes the limitation, and the second merely forfeits the vessel if this limitation be exceeded by the number of twenty passengers. This barque cannot, therefore, be forfeited under that act.

Now, in reference to the second point made by the learned prosecutor in behalf of the government, what are the provisions of the law of 1847? The first section of said act, leaving out for the present all that part which speaks of stores, luggage, &c., reads thus: "That if the master of any vessel, &c., shall take on board such vessel at any foreign port or place, a greater number of passengers than in the following proportion to the space occupied by them and appropriated for their use, on the lower deck or platform, one passenger for every fourteen clear superficial feet, &c., with intent to bring such passengers to the United States, and shall leave such port or place with the same, and bring the same or any number thereof, within the jurisdiction of the United States aforesaid." And the second section provides "that if the passengers so taken on board of such vessel, and brought into or transported from the United States, &c." The court thinks that under this law, no conviction can take place, except where an illegal number of passengers has been taken on board at a foreign port, with the intention to bring them into the United States, and such illegal number has been brought in, or where an illegal number has been taken on board at a port in the United States, with the intention to transport them to a foreign port. In the former case the court would have no right to convict for the mere intention formed beyond the jurisdiction of the United States. The intention must be carried out by the illegal importation into this country. Even if the law were doubtful, we should not so construe it, as to make congress vio-

late the law of nations, and attempt to punish offences committed beyond the jurisdiction of the country. But the court deems the language of the law clear, beyond all question upon this subject. The word "so" in the second section upon which the learned counsel for the United States relied to support his view, obviously refers to the "intention to bring into or transport from the United States" as mentioned and specified in the first section. In reference to the third point, to wit: By what measurement is the court to be guided in ascertaining the capacity of the vessel for passengers? it appears clear to the court, that whenever the officers of the government have measured the vessel, ascertained her capacity, and given that result to the captain upon which he has acted, the government would be bound by it. It appears by Captain Barnes' testimony, page 30, and also by the testimony of Captain McDonald, that it is the usage and practice of the officers of the government at this port, to measure all passenger vessels, where they have not been previously measured at some other port of the United States, and to give to their masters a certificate of said measurement. Now, this practice would bind the government, except where it would come in conflict with the provisions of the law on the subject. For this principle, I refer to the case of U. S. v. Fillebrow, to be found in 7 Pet. [32 U. S.] 28. But if no usage had been proved, I should still hold that the proper measurement was the one made by the surveyor of the port, and under his direction, and on which the master and owners of the vessel had acted. For, as no one is designated by the law of 1847 to make the measurement, if we do not take the custom house measurement, by what measurement shall we be guided? By the measurement in a foreign port, or by the measurement of any ship carpenter employed by the master here? We have seen enough in this case to show us that this rule would lead to great confusion. In the regulation of vessels coming into our ports, to be examined and inspected by our officers, to ascertain whether they have complied with our laws, congress must have intended that the capacity of these passenger vessels should be ascertained and declared by the same officers whose duty it may be to enforce the penalties for their violation. We must take the custom house measurement, therefore, where no part of the space usually allowed to passengers is occupied by cargo, stores, &c., but where the whole space formerly measured is not appropriated to and used by the passengers. Barnes proves that it is the practice of the boarding officer to measure the space actually occupied by them. The master must, at his peril, see that in the space actually allotted to the passengers in the particular voyage, he attempts to carry no more than that space would contain by the custom house measurement, after deducting for the spaces he may have thought proper to occupy with cargo, stores, &c. To enable him to make this calculation, it is usual for the boarding officer, when he makes his first measurement, to furnish the master with a diagram of his vessel, showing her capacity for passengers in sections. The captain of the Anna was furnished with such a diagram. By that diagram, which the captain had with him since 1851, and which was made for him by Captain Barnes, then the official measurer of vessels at this port, it appears that the two spaces forward and aft, enclosed by the supposed bulkheads, would contain 534 superficial feet, equal to 38 passengers, leaving 154 passengers for the middle space. By Captain Barnes' diagram, marked "R. C. B.," and made by request of the counsel of the claimants in this case, the middle space between the bulkheads contained 2083 superficial feet, equal to 149 passengers, and the spaces within the bulkhead contained 608 superficial feet, equal to 43 passengers. This was made from the data furnished by the custom house measurement. By Mr. Abrahams' calculation, the capacity of the vessel between the bulkheads was 2122 superficial feet, equal to 151 passengers, and the spaces behind or enclosed by the bulkhead contained 479 superficial feet, equal to 34 passengers, and making the whole number 185. By the measurement made by Messrs. McDonald, Barnes and Abrahams, it appears that the middle space contains 2074 superficial feet, equal to 148 passengers, and the spaces back and forward of the bulkheads contain 527 superficial feet, equal to 37 passengers. So that it appears by any and all of these diagrams and calculations, the middle part could not be made to contain legal space for more than 154 passengers at the outside. She then carried and brought into this country 20 over the number; and is forfeited by the act of 1847, if the court is satisfied from the testimony, that the space forward of the supposed bulkhead was not appropriated to and used by the passengers; or, at least, that space was not left there for at least one or more passengers. And here, before I discuss the testimony in reference to this part of the case, it is necessary to settle what is included in the term "personal luggage," used in the act of 1847.

The term "luggage" is used in England, as I am informed, in the same sense in which we use the word "baggage" in this country. Now, it has never been ascertained with certainty what things may or may not be included in the term "baggage"; but I should suppose it would be limited to such articles of necessity or personal convenience as are usually carried by passengers for their personal use, and would not include merchandise or other effects. For this construction, see Story, Bailm. § 499; 9 Humph. 622; 11 Humph. 419; 5 Cush. 69; 25 Wend. 459. And more particularly is this construction required for this act, in which the word "per-

sonal" is placed before the word "luggage." Congress was aware that these emigrants frequently brought with them articles of furniture, agricultural and mechanical instruments, and determined, by the passage of this act, that none of these things should occupy a part of, or interfere with the space of the vessel which was required to be appropriated for the use of each passenger on the voyage. I shall therefore always hold, in the construction of this passenger act, that the term "personal luggage" only includes wearing apparel and bed and bedding of the passengers required for their comfort and convenience on the passage. Any other construction, it appears to me, would defeat the wise and humane views of the legislature in the enactment of the law. The learned counsel of the claimants, by the course of their examination, sought to enlarge the construction of these words, so as to include all articles which the passengers were permitted to bring in duty free. But it will be found, on an examination of the tariff act of 1846 [9 Stat. 42], that many articles are admitted with the passengers free of duty that could not come under the classification of "personal luggage" in the most liberal construction of that term.

Now, having settled the construction to be given to these words in the act of 1847, let us look at the testimony in the case. And here I approach the only part of the cause which has given me any embarrassment. The testimony is apparently contradictory—and I have felt, during my examination of this testimony, more disposed than ever, to sympathize with juries who are called upon so frequently to reconcile or draw their deductions from conflicting evidence. But in the review of this testimony, I have been guided by what I consider to be two leading rules of evidence. 1st. That in all cases of conflicting evidence, the first step in the process of inquiry should be, to ascertain whether the apparent inconsistencies which it presents, may not, without violence, be reconciled; and if not, to what extent and in what particulars, the adverse evidence is irreconcilable. And 2dly. That in case of conflict of testimony, the greater weight should be given to the testimony of those witnesses whose position gave them the best opportunity for observation.

Now, by the testimony in the case, what was the condition of the forward part of this vessel between decks on her last voyage? The government has produced ten witnesses in all, only one of whom, Dr. Pahmeyer, undertakes to speak of its condition when they left Bremer Haven and on the passage. Eight of these witnesses. Messrs. McDonald, Pickering, Williams, Winter, Bosley, Barrier. Collier and Pitts, are custom-house officers at this port, and only saw the vessel after her arrival here. And of all these, Captain McDonald is the only one who speaks of what was contained in the forward space

at the quarantine. He boarded the barque on the 19th, at quarantine, but did not measure her until the 21st of December, after her arrival at the wharf. Mr. Pickering did not see her until the 23d December. Williams does not speak of the condition of the forward space until he held the line to measure the vessel on the 21st, and then he says "he did not look over the casks to see what was behind them." Bosley took no particular notice of what was forward. Collier saw nothing forward. Barrier never went below until the vessel arrived at the wharf; and then he cannot say what was behind the casks. Pitts did not examine what was behind the forward bulkhead, and Winter only saw a few casks forward. Mrs. Pahmeyer never went below until the morning of the vessel's arrival at the wharf. And Dr. Pahmeyer's testimony presents this contradiction: that when the vessel left Bremer Haven, the space forward was pretty full of tierces, chests and casks—and yet he says, that after the storm he saw a great many more there. Besides, I could not rely upon the testimony of a professional man whose memory is so treacherous that he could not recollect the names of the patients whom he had attended, or the name of the lawyer whom he had employed in what he considered an important cause. Now the claimants have proved by twelve witnesses who were in the vessel for nearly two months, and who were passengers between decks, and, therefore, must have seen this part of the barque daily, that when she left Bremer Haven, there was nothing forward but one or two passengers' chests, and that subsequently when they had left England they encountered a storm by which water got into the lower hold and wet the passengers' chests and casks that were there. They were brought up, their clothes and bedding dried, and then put forward with two casks of potatoes; but that the space was at no time full or anything near full. That they could at all times go round the casks and forward of them, and march about there for exercise. And that there was no rope or cargo there. They are confirmed in this statement by the mate and cook of the barque.

Now, may not all this testimony be reconciled without imputing perjury to any one? I think so; and I think the mate's testimony gives the key to unlock this apparent difficulty. He says, that there were a few passengers' chests forward when they left England, that more were placed there after the storm, together with the two casks of potatoes, and that after they arrived at quarantine and a part of the passengers were gone, they began to clean up between decks, and he placed in the forward space some ropes and several barrels. Albert Christopher also testifies to the placing the rope there after the arrival of the vessel. Ernest Schultze testifies that there was no rope in

that space forward on the voyage; that he left the Anna the day she came to the wharf; that he went down to the vessel the next day to get his things; that he went between decks and he took notice that the state of things about the foremast was not the same as before, different articles were taken away and other things put there that were not there before. Another witness speaks of their taking down the berths, and one of the witnesses for the government speaks of seeing boards forward between decks. They were no doubt the boards of the berths which had been taken down. Now from this testimony can the court say that this forward space was entirely occupied, and the passengers had no use of the same? It contained 262 superficial feet, equal to 18 passengers. Now, place there all the boxes of which any of the witnesses have spoken, say 30, and you would not fill but a little more than one-third of the space. Add to them the three casks, and you will still have more than half of the space vacant, or legal capacity for nine passengers. Now, can a conviction be justified upon such testimony? The burden of proof is upon the government in a case like this, and if the mind of the court is in doubt, it should not enforce the forfeiture. If this forward space had been filled up with cargo, the government could have shown it by Mr. Cole, the inspector, who discharged the vessel. They have failed to do so, and have not proved a case entitling them to a decree of forfeiture. I will therefore sign a decree dismissing the libel filed in this case.

[Affirmed by the circuit court on appeal. Case No. 14,458.]